**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**MICHAEL R. FISHER**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana



FILED
Oct 17 2012, 9:28 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| NORMAN BARKER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1201-CR-20 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Carol J. Orbison, Judge
Cause No. 49G22-1007-MR-56772

**October 17, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

Appellant-Defendant Norman Barker appeals following his convictions of murder and felony murder, both felonies;[1] Class A felony robbery;[2] Class A felony conspiracy to commit robbery;[3] and Class A misdemeanor carrying a handgun without a license.[4] Barker contends that the trial court abused its discretion in admitting certain evidence and that his aggregate sixty-five-year sentence is inappropriately harsh. We affirm.

## FACTS AND PROCEDURAL HISTORY

Approximately two weeks prior to July 20, 2010, Barker and his friend Eric Lipscomb were presented by Chelsea Stewart with the idea of robbing Robert Spaulding's Indianapolis house. The duo believed that they would be able to take $20,000 and eleven pounds of marijuana from Spaulding. At Lipscomb's house, Barker, Lipscomb, and Stewart discussed a plan to rob Spaulding with Lipscomb's girlfriend Jessica Brackett and Barker's girlfriend and Stewart's cousin Jessica Owens. Stewart showed Barker and Owens where Spaulding lived and Barker provided firearms.

On July 20, 2010, Barker, Lipscomb, Owens, and Bracket went to a Wal-Mart in Camby to purchase .40 caliber ammunition to be used in the robbery. The group planned to use two guns, one of which was a black .40 caliber automatic handgun to be used by Barker. (Tr. 124). When it was dark, the quartet drove to Spaulding's neighborhood in Brackett's

---

[1] Ind. Code § 35-42-1-1 (2010).

[2] Ind. Code § 35-42-5-1 (2010).

[3] Ind. Code §§ 35-42-5-1; 35-41-5-2 (2010).

[4] Ind. Code § 35-47-2-1 (2010).

white Blazer but left when they observed too many cars in the area, retreating to Lipscomb's for approximately one hour. When the quartet returned, Brackett parked the Blazer while Barker and Lipscomb proceeded on foot to Spaulding's house, located at 219 West Southern Street.

Once inside Spaulding's house, Lipscomb ordered Spaulding to the ground and the duo asked where his "sack was that he's supposed to keep his stuff in." State's Ex. 120 at 34. Spaulding replied that there were some drugs in the kitchen, so Barker walked into the kitchen and retrieved a small bag of marijuana as well as Spaulding's keys. When Barker returned, a struggle for his handgun ensued with Spaulding. Barker's gun fired during the struggle, and he yelled for Lipscomb, telling him to "'get him'". State's Ex. 120 at 36. Lipscomb shot, hitting Spaulding. Spaulding continued to struggle, managing to grab Barker's handgun from his hand and take hold of his shirt. As Barker attempted to pull his shirt off, Lipscomb fired a second time, hitting both Barker and Spaulding. Barker and Lipscomb ran back to the blazer, Barker leaving his handgun and shirt behind. Barker also left a trail of blood as he ran from Spaulding's house. As Barker and Lipscomb ran, a witness heard Barker say "the mother-f***** shot me." Tr. p. 256.

After neighbor Devon Watson witnessed Barker and Lipscomb flee, she called 911 at approximately 12:14 a.m. and ran to Spaulding's house. Spaulding was still alive when Watson arrived and was coughing up blood and saying the name of his two-year-old daughter. Although emergency help arrived at approximately 12:21 a.m., Spaulding had already died, with his daughter asleep in the next room.

3

Meanwhile, Barker, Lipscomb, Brackett, and Owens drove to a Village Pantry approximately one to one-and-one-half miles away, at 1402 South Meridian Street. Owens called 911 at approximately 12:16 a.m. and told the operator that Barker had been shot, and, in the background, Lipscomb can be heard saying, "[w]e can't be this close to the property[,]" and Brackett can be heard saying, "[t]hrow that gun out the window." Tr. p. 455. The quartet decided that they would tell police that Barker had been wounded in a drive-by shooting. Owens was instructed to tell police that she and Barker were by a Burger King when Barker pushed her to the ground and was shot, at which point Owens called Brackett and Lipscomb to retrieve them.

Indianapolis Metropolitan Police Detective Brian Schemenaur responded to 219 West Southern and spoke with Watson and additional witness Jenny Sterling, who each provided descriptions of the two males they saw fleeing Spaulding's house. Detective Schemenaur was also told that one of the suspects had been shot and was able to corroborate the story by finding the trail of blood left by Barker. Detective Jeffrey Wager responded to 1402 South Meridian. Based on information relayed from 219 South Western, detective Wager noticed that Barker fit the description of one of the suspects. Detective Wager also learned at some point that one of the suspects had been shot. By 1:00 a.m., Detective Wager had concluded that there was a high probability that Barker was involved in the homicide at 219 West Southern.

After Barker had been taken to the hospital, Sergeant Michael Duke, who did not know about the shooting at 219 West Southern, spoke with Barker about his wound.

4

Sergeant Duke found it odd that Barker had supposedly called a friend to take him to the hospital instead of 911, that Barker could not really account for his activities prior to the shooting, and, that, according to Barker's story, he and the others were not, in fact, headed in the direction of any nearby hospital. At approximately 3:40 a.m., Barker was transported to the homicide office along with his clothing, which had been removed at the hospital. Detective Wager inventoried Barker's items and found Spaulding's keys in the pocket of a pair of shorts.

At 8:38 a.m., Detective Schemenaur interviewed Barker. Barker initially repeated the story that he had been shot in a drive-by. At 9:04 a.m., Detective Schemenaur *Mirandized*[5] Barker and began questioning regarding the homicide at 219 West Southern. Barker denied being at 219 West Southern, but consented to a cheek swab for DNA when Detective Schemenaur told him that blood belonging to a suspect had been found at the scene. After Barker consented to the cheek swab, Detective Schemenaur told Barker that police had found Spaulding's keys in the pocket of Barker's shorts; that his story was not consistent with those of Lipscomb, Owens, and Brackett; and that witnesses saw Spaulding's assailants running away. Barker then admitted that he had been at 219 West Southern during the robbery but that Lipscomb had shot Spaulding. Barker's DNA was eventually found in samples recovered from the living room wall and porch of Spaulding's house, the road next to Spaulding's house, and the gray shirt found inside.

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

On July 26, 2010, the State charged Barker with murder, felony murder, Class A felony robbery, and two counts of Class A misdemeanor carrying a handgun without a license.[6] On August 9, 2010, the State added a charge of Class A felony conspiracy to commit robbery. On September 28, 2010, Barker moved to suppress evidence related to his clothing that had been taken from him at the hospital as well as all testimony related to the allegedly illegal search. On November 12, 2010, the trial court denied Barker's suppression motion. On November 29, 2011, a jury found Barker guilty as charged.

On December 14, 2011, the trial court sentenced Barker to sixty-five years of incarceration for murder, twenty years for robbery, one year of carrying a handgun without a license, and eight years for conspiracy to committed robbery, all sentences to be served concurrently, and imposed no sentence for felony murder. The trial court found Barker's juvenile record and the circumstances of the crime to be aggravating circumstances.

## DISCUSSION AND DECISION

### I. Whether the Trial Court Abused its Discretion in Admitting Certain Evidence

Barker contends that the trial court abused its discretion in admitting any evidence resulting from the seizure of Spaulding's keys from his shorts pocket. The admissibility of evidence is within the sound discretion of the trial court. *Curley v. State*, 777 N.E.2d 58, 60 (Ind. Ct. App. 2002), *trans denied*. We will reverse a trial court's decision on the admissibility of evidence only upon a showing of an abuse of that discretion. *Id.* An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of

---

[6] At some point, one of the carrying a handgun without a license charges was apparently dropped.

6

the facts and circumstances before the court, or if the court has misinterpreted the law. *Id.* The Court of Appeals may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though it was not the reason enunciated by the trial court. *Moore v. State*, 839 N.E.2d 178, 182 (Ind. Ct. App. 2005), *trans. denied.* We do not reweigh the evidence, and consider the evidence most favorable to the trial court's ruling. *Hirsey v. State*, 852 N.E.2d 1008, 1012 (Ind. Ct. App. 2006), *trans. denied.*

We need not address the merits of Barker's arguments, however, if we conclude that even an erroneous admission of the evidence in question could only be considered harmless. "[A]n evaluation for harmless error involves considering the likelihood that the questioned evidence may have contributed to the conviction." *Davis v. State*, 598 N.E.2d 1041, 1048 (Ind. 1992). "Erroneously admitted evidence may be found to be harmless where a determination of guilt is supported by overwhelming independent evidence." *Id.*

Even if we assume that the keys were unconstitutionally seized, we conclude that admission of evidence regarding them and resulting from them was harmless. The keys represented evidence that placed Barker at the scene of Spaulding's homicide, but this evidence was far from the only evidence against Barker and far from the most compelling. Most damning, of course, were the DNA samples found at the scene, which not only placed Barker at the scene but placed him at the scene at the time of the shooting and established that he was the assailant who was wounded during the incident. As previously mentioned, Barker's DNA was found in a blood sample taken from a wall and a shirt inside Spaulding's house, in a blood sample taken from the porch, and in the blood trail leading away from the

7

house. The keys merely established that Barker had been in Spaulding's house at some point, but the DNA established that Barker had been shot while there and was therefore one of the persons who had robbed and killed him. Barker agreed to allow a cheek swab to be taken before being told that Spaulding's keys had been found in his clothing, which sample ultimately led to matching his DNA to that found at the scene.

The DNA evidence is hardly the only other evidence tying Barker to Spaulding's murder. Owens testified for the State and detailed how Barker and Lipscomb were taken to Spaulding's neighborhood with the purpose of robbing him, were dropped off, went into his home, and ran back shortly after the sound of two gunshots, with Barker shot in the left arm. Owens also testified that the quartet decided to fabricate the story about the drive-by shooting at a Burger King. Barker's appearance and dress the night of the shooting generally jibe with the eyewitness accounts of three persons who saw Spaulding's assailants flee after the shooting. As the result of a 911 call made minutes after Spaulding's murder, Barker was found a mile to a mile-and-a-half away from Spaulding's house suffering from a gunshot wound when there was ample evidence that one of Spaulding's attackers had been shot. The stories told to police by Barker and his cohorts were not consistent, and portions of them, despite being generally consistent, were inherently suspect, including how Barker allegedly called Brackett and Lipscomb to take him to the hospital instead of the authorities and that their alleged direction of travel before arriving at 1402 South Meridian was not in the direction of any nearby hospital.

Finally, Barker incriminated himself in the statement taken on the morning of July 21,

2010.  Barker contends that this statement resulted from Detective Schemenaur telling him about the keys, but we consider this highly unlikely.  Put another way, even if the seizure of the keys was unconstitutional, Barker's confession was not the "fruit of the poisonous tree."

> The "fruit of the poisonous tree" doctrine is one facet of the exclusionary rule of evidence which bars the admissibility in a criminal proceeding of evidence obtained in the course of unlawful searches and seizures.  When applied, the doctrine operates to bar not only evidence directly obtained, but also evidence derivatively gained as a result of information learned or leads obtained during an unlawful search or seizure.  To invoke the doctrine, a defendant must show that challenged evidence was obtained by the State in violation of the defendant's Fourth Amendment rights.  Stated differently, the defendant must show that the search or seizure was illegal in the first instance. Where there is no illegal search or seizure, there can be no "fruit of the poisonous tree."
>     However, the "fruit of the poisonous tree" doctrine has no application when the derivative evidence has an "independent source[.]"

*Hanna v. State*, 726 N.E.2d 384, 389 (Ind. Ct. App. 2000) (citations omitted).

For much the same reasons that we have concluded that the admission of evidence relating to Spaulding's keys, even if erroneous, was harmless, we conclude that Barker's confession was derived from other evidence.  As previously mentioned, Barker agreed to submit to a cheek swab before even learning about the keys found in his pocket, and must have believed that DNA testing would establish that he was the suspect who was shot at Spaulding's house.  Detective Schemenaur also told Barker that he had already spoken to Lipscomb, Owens, and Brackett and that their stories did not match Barker's and that witnesses had seen Spaulding's assailants running away from his house.  We conclude that Barker's confession was not the result of being told that Spaulding's keys were found in his pocket.  Because of the overwhelming evidence of Barker's guilt, any error the trial court

9

may have made in admitting evidence regarding Spaulding's keys can only be considered harmless.

## II. Whether Barker's Sentence is Inappropriate

We "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Shouse v. State*, 849 N.E.2d 650, 660 (Ind. Ct. App. 2006), *trans. denied* (citations and quotation marks omitted). "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). In addition to the "due consideration" we are required to give to the trial court's sentencing decision, "we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). As previously mentioned, the trial court sentenced Barker to an aggregate sixty-five years of incarceration.

The nature of Barker's offenses is that they were premeditated and involved being prepared to use deadly force during their commission. Barker secured the firearms used in the robbery and both his and Lipscomb's handguns were loaded. One should not invade

10

another's home armed with a firearm and be surprised when violence is the result. Moreover, photographs of Spaulding's house show toys and other items in plain view that indicate the presence of a child in the house. Finally, it should be noted that Barker and his cohorts had plenty of opportunities to rethink their plan, but did not. The robbery had been planned approximately two weeks beforehand, and the quartet even called off the robbery earlier in the evening on July 20, 2010, only to return later and try again. The nature of Barker's offenses warrants a lengthy sentence.

Barker's character also justifies a harsh sentence. Although Barker, who was eighteen years old in July of 2010, had no prior adult criminal history, his juvenile record is extensive, to say the least. As a juvenile, Barker was charged with a total of twenty-nine counts of delinquency, resulting in six true findings, including three that would have been felonies if committed by an adult–auto theft, theft, and escape. Barker's numerous contacts with the juvenile justice system did not cause him to reform himself. In a short time, Barker graduated from relatively minor property crimes to a robbery resulting in a man's death. Barker's complete lack of any remorse over Spaulding's death also speaks ill of his character. In a telephone call to family from jail, Barker's attempt to explain how he was not the shooter consisted, in part, of the following statement: "I didn't do that s*** … like I said, if I'd shot f****** dude I'd have shot him right between his f****** eyes and got away." State's Ex. 126. Barker's character also fully justifies a harsh sentence. Barker has failed to establish that his sixty-five-year aggregate sentence was inappropriate.

We affirm the judgment of the trial court.

11

ROBB, C.J., and BAKER, J., concur.